IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDWARD RUST, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-10 (MN) |
| | ) | |
| CLAIRE DEMATTEIS, Commissioner, | ) | |
| Delaware Department of Corrections, | ) | |
| ROBERT MAY, Warden, and ATTORNEY | ) | |
| GENERAL OF THE STATE OF | ) | |
| DELAWARE, | ) | |
| | ) | |
| Respondents.[1] | ) | |

## __MEMORANDUM OPINION__

Christopher S. Koyste, Wilmington, DE – Attorney for Petitioner

Kathryn Joy Garrison, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware – Attorneys for Respondents

March 15, 2021
Wilmington, Delaware

---

[1]     Commissioner Claire DeMatteis replaces former Commissioner Perry Phelps, and Warden Robert May replaces former Warden Dana Metzger.  *See* Fed. R. Civ. P. 25(d).

NOREIKA, U.S. DISTRICT JUDGE:

Pending before the Court is an Application For A Writ Of Habeas Corpus Pursuant To 28 U.S.C. § 2254 ("Petition") filed by Petitioner Edward Rust ("Petitioner").  (D.I. 3; D.I. 12).  The State filed an Answer in opposition, to which Petitioner filed a Reply.  (D.I. 14; D.I. 15).  For the reasons discussed, the Court will deny Petitioner's § 2254 Petition.

I.      **BACKGROUND**

> On October 3, 2011, [Petitioner] was arrested by police on suspicion that he was involved with growing and selling marijuana. According to police reports, [Petitioner] confessed that he drove around the state cutting and gathering marijuana, storing it on his property, and providing it to others to sell. Police obtained a search warrant and discovered marijuana in several sheds. They also received consent to search other areas around the property and discovered still more marijuana.
>
> From shed number 1, officers seized 7 grams of loose marijuana and 107 grams of marijuana in a bag. From shed number 2, police seized a glass jar containing a plastic bag of 29 grams of marijuana, an ibuprofen bottle of 36 grams of marijuana, other bottles with trace amounts of marijuana, and a morphine bottle with 11 grams of marijuana seeds. From shed number 3, police recovered a red cup with 47 grams of marijuana and seeds and 3 grams of loose marijuana. Elsewhere on the property, police seized four one gallon Ziplock bags of marijuana containing 233 grams, 239 grams, 232 grams, and 234 grams, one paper bag with 579 grams of marijuana, a white plastic shopping bag with 234 grams of marijuana, a white plastic bag containing 133 grams of marijuana, a yellow plastic bag containing 184 grams of marijuana, a large black plastic bag containing 1.2 kg of marijuana, and another large plastic bag containing 545 grams of marijuana.
>
> The drug evidence was tested by forensic chemists within the OCME. The items that were tested returned positive for the suspected substances. There were minor discrepancies in the weights of the substances as collected and as tested.

*State v. Rust*, 2017 WL 986169, at *1 (Del. Super. Ct. Mar. 8, 2017).  On July 25, 2012, Petitioner pleaded guilty to drug dealing.  (D.I. 14 at 1).  The Superior Court sentenced him on August 8, 2012

to twenty-five years at Level V incarceration, suspended after ten years for six months at Level IV home confinement, followed by one year at Level III probation.  Petitioner did not appeal his conviction or sentence.  (*Id*.).

On July 8, 2013, Petitioner filed a motion for time served, which the Superior Court granted on October 9, 2013.  (D.I. 14 at 1).

On June 2, 2014, Petitioner filed a *pro se* motion for post-conviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion").  (D.I. 12 at 8).  The Superior Court appointed the Office of Conflict Counsel to represent Petitioner.  (*Id*. at 9).  On April 12, 2016, Petitioner's counsel filed an amended Rule 61 motion, asserting that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to inform Petitioner prior to the entry of his plea about an evidence mishandling scandal at the Office of the Chief Medical Examiner ("OCME"). (D.I. 13-7 at 54-90; D.I. 13-8 at 1-20).  Petitioner also contended that his lack of knowledge about the OCME evidence mishandling was material to his decision to plead guilty and, therefore, his guilty plea was involuntary pursuant to *Brady v. United States*, 397 U.S. 742, 748 (1970).  (D.I. 13-7 at 85-90).  The Superior Court denied the Rule 61 motion on March 8, 2017.  *See Rust*, 2017 WL 986169, at *5.  The Delaware Supreme Court affirmed that decision on November 20, 2017.  *See Rust v. State*, 175 A.3d 620 (Table), 2017 WL 5593174 (Del. Nov. 20, 2017).

On January 2, 2018, Petitioner filed the § 2254 Petition presently pending before the Court, followed by an Opening Brief in Support.  (D.I. 3; D.I. 12).  The State filed an Answer asserting that the Petition should be denied as time-barred, procedurally barred and, alternatively, as meritless.  (D.I. 14).  Petitioner filed a Reply in opposition.  (D.I. 15).

### A.    OCME Criminal Investigation

The relevant information regarding the OCME evidence mishandling is set forth below:

In February 2014, the Delaware State Police ("DSP") and the Department of Justice ("DOJ") began an investigation into criminal misconduct occurring in the Controlled Substances Unit of the OCME.

The investigation revealed that some drug evidence sent to the OCME for testing had been stolen by OCME employees in some cases and was unaccounted for in other cases. Oversight of the lab had been lacking, and security procedures had not been followed. One employee was accused of "dry labbing" (or declaring a test result without actually conducting a test of the evidence) in several cases. Although the investigation remains ongoing, to date, three OCME employees have been suspended (two of those employees have been criminally indicted), and the Chief Medical Examiner has been fired.

There is no evidence to suggest that OCME employees tampered with drug evidence by adding known controlled substances to the evidence they received for testing in order to achieve positive results and secure convictions. That is, there is no evidence that the OCME staff "planted" evidence to wrongly obtain convictions. Rather, the employees who stole the evidence did so because it in fact consisted of illegal narcotics that they could resell or take for personal use.

*Brown v. State*, 108 A.3d 1201, 1204-05 (Del. 2015).

## II.   <u>PETITION IS TIME-BARRED</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") prescribes a one-year period of limitations for the filing of habeas petitions by state prisoners, which begins to run from the latest of:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  AEDPA's limitations period is subject to statutory and equitable tolling. *See Holland v. Florida*, 560 U.S. 631, 645 (2010) (equitable tolling); 28 U.S.C. § 2244(d)(2) (statutory tolling).

Petitioner's § 2254 Petition, filed in 2018, is subject to the one-year limitations period contained in § 2244(d)(1).  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The State contends that the starting date for the limitations period is September 7, 2012, the date on which Petitioner's conviction became final.  (D.I. 14 at 7).  Petitioner, however, appears to assert that he is entitled to one of two later starting dates for AEDPA's limitations period under § 2244(d)(1)(D), either: (1) January 14, 2014, because that is the earliest date the OCME evidence misconduct was discovered (D.I. 12 at 16); or (2) April 15, 2014, because that is date on which the State began to notify defendants in active cases that multiple cases had been compromised by the OCME evidence misconduct scandal (D.I. 12 at 17).

Petitioner's primary claim is that his guilty plea was rendered involuntary under *Brady v. United States* because the State's failure to disclose the OCME evidence misconduct scandal prior to his plea violated *Brady v. Maryland*.  This Court has previously determined how to address the timeliness of cases asserting *Brady*/involuntary guilty plea claims premised on the OCME evidence misconduct scandal.  *See, e.g.*, *Williams v. DeMatteis*, 2019 WL 4222646 (D. Del. Sept. 5, 2019); *Wooten v. DeMatteis*, 2019 WL 4222669 (D. Del. Sept. 5, 2019); *Oney v. DeMatteis*, 2019 WL 4222657 (D. Del. Sept. 5, 2019). Basically, for purposes of the inquiry under § 2244(d)(1)(D), whether or not the OCME misconduct affected, or could have affected, Petitioner's decision to plead guilty depends on whether the drugs in his case were tested by the

4

OCME and the results were provided to him prior to entering a plea.  Therefore, in order to trigger a later starting date under § 2244(d)(1)(D) for the instant involuntary plea/*Brady* claim, Petitioner must show that (1) the drug evidence in his case was tested by the OCME and he received the results of the test before entering a plea; and (2) exercising due diligence, he could not have learned that the evidence in his case may have been part of the compromised drug evidence involved in the OCME scandal until April 15, 2014.  For the following reasons, the Court concludes that Petitioner has met this burden.

First, Petitioner pleaded guilty on July 25, 2012.  The suspected drug evidence was sent to the OCME for forensic testing.  Forensic chemists Theresa Moore and Farnam Daneshgar of the OCME tested the drugs and confirmed that there were over 2,600 grams of marijuana.  (D.I. 14 at 3-4).  The State provided copies of the lab reports to Petitioner's defense counsel on January 4 and April 4, 2012.  (D.I. 13 at 41; D.I. 14 at 4).  Second, facts sufficient to provide a basis for a good faith claim that state employees engaged in impermissible conduct were not available to defense counsel representing other prisoners until April 15, 2014 when, as part of its *Brady v. Maryland* obligation, the State informed other defendants that all drug evidence housed at the lab was susceptible to compromise.[2]  (D.I. 12 at 17).

---

[2]     Although the Delaware State Police ("DSP") began its investigation into compromised drug evidence on January 15, 2014, and the Deputy Attorney General's office informed defense counsel on February 21, 2014 that an investigation into the evidentiary practices at the OCME had started on February 20, 2014, the Court concludes that sufficient facts for the instant argument were not available until the State provided the relevant information on April 15, 2014.  *See Biden: Investigation of State Medical Examiner's Drug Lab Reveals Systemic Failings, Urgent Need for Reform*, Dep't of Justice, Att'y Gen.'s Website (June 19, 2014), https://news.delaware.gov/2014/06/19/biden-investigation-of-state-medical-examiners-drug-lab-reveals-systemic-failings-urgent-need-for-reform/.

Given these circumstances, the Court concludes that AEDPA's limitations period in this case began to run on April 15, 2014.[3]  Accordingly, to comply with the one-year limitations period, Petitioner had to file his § 2254 petition by April 15, 2015.  *See Wilson v. Beard*, 426 F.3d 653 (3d Cir. 2005) (holding that Federal Rule of Civil Procedure 6(a) and (e) applies to federal habeas petitions); *Phlipot v. Johnson*, 2015 WL 1906127, at *3 n. 3 (D. Del. Apr. 27, 2015) (AEDPA's one-year limitations period is calculated according to the anniversary method, *i.e.*, the limitations period expires on the anniversary of the date it began to run).

Petitioner did not file the instant § 2254 Petition until January 2, 2018, approximately two years and eight months after the expiration of AEDPA's statute of limitations.  Therefore, the Petition is time-barred, unless the limitations period can be statutorily or equitably tolled.  *See Holland v. Florida*, 560 U.S. 631, 645 (2010) (equitable tolling); 28 U.S.C. § 2244(d)(2) (statutory tolling).

---

[3]   The State relies on *Harmon v. Johnson*, 2016 WL 183899, at *3 (D. Del. Jan. 14, 2016) to support its argument that § 2254(d)(1)(D) is inapplicable and therefore cannot trigger a later starting date in Petitioner's case. The Court disagrees because *Harmon* is distinguishable.  Harmon argued that his conviction should be vacated because the State violated *Brady v. Maryland* by failing to disclose its knowledge of the OCME drug evidence scandal during his plea process and by waiting until long after his conviction in 2012 to disclose the tampering.  *See Harmon*, 2016 WL 183899, at *2-3.  Because, however, the drug evidence in *Harmon* was never sent to the OCME for testing, the court found that the revelation of the OCME scandal in 2014 could not constitute a new factual predicate for Harmon's substantive *Brady v. Maryland* claim.  *Id*.  Here, unlike Harmon, Petitioner argues that the alleged lack of knowledge of the OCME misconduct was material to his decision to plead guilty, thereby rendering his guilty plea involuntary under *Brady v. United States*.  In addition, unlike in *Harmon*, the drug evidence in Petitioner's case was sent to the OCME for further testing after the initial field test, and Petitioner received a copy of the OCME report prior to pleading guilty.  Thus, given these circumstances, the Court concludes that the revelation of the OCME scandal constitutes a new factual predicate for Petitioner's instant argument.

6

### A.     Statutory Tolling

Pursuant to § 2244(d)(2), a properly filed application for state collateral review tolls AEDPA's limitations period during the time the application is pending in the state courts, including any post-conviction appeals, provided that the application is filed during AEDPA's one-year limitations period. *Swartz v. Meyers*, 204 F.3d 417, 424-25 (3d Cir. 2000).  Notably, a state post-conviction motion that is rejected by a state court as untimely is not "properly filed" for § 2244(d)(2) purposes. *See Pace v. DiGuglielmo*, 544 U.S. 408, 410  (2005); *Erskine v. Pierce*, 225 F. Supp. 3d 246, 251–52 (D. Del. 2016).

When Petitioner filed his Rule 61 motion on June 2, 2014, only forty-seven days of AEDPA's limitations period had expired.  Nevertheless, because the Superior Court denied the Rule 61 motion as time-barred under Rule 61(i)(1), the Rule 61 motion was not properly filed for § 2244(d)(2) purposes.  In other words, the Rule 61 motion does not statutorily toll the limitations period.  Therefore, the Petition is time-barred, unless equitable tolling applies.

### B.     Equitable Tolling

Pursuant to the equitable tolling doctrine, the one-year limitations period may be tolled in very rare circumstances for equitable reasons when the petitioner demonstrates "(1) that he has been pursuing his rights diligently, **and** (2) some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 560 U.S. at 649 (emphasis added).  Equitable tolling is not available where the late filing is due to the petitioner's excusable neglect. *Id.*; *Miller v. New Jersey State Dept. of Corr.*, 145 F.3d 616, 618-19 (3d Cir. 1998)*.*  A petitioner's obligation to act diligently applies to both his filing of the federal habeas application and to his filing of state post-conviction applications. *See LaCava v. Kyler*, 398 F.3d 271, 277 (3d Cir.2005).  In turn, the Third

Circuit has explained that equitable tolling of AEDPA's limitations period may be appropriate in the following circumstances:

> (1) where the defendant (or the court) actively misled the plaintiff;
> (2) where the plaintiff was in some extraordinary way prevented from asserting his rights; or
> (3) where the plaintiff timely asserted his rights mistakenly in the wrong forum.

*Jones v. Morton,* 195 F.3d 153, 159 (3d Cir. 1999)*; Thomas v. Snyder*, 2001 WL 1555239, at *3-4 (D. Del. Nov. 28, 2001).

Here, Petitioner asserts that, "if this Court should determine that [his] petition was not timely pursuant to 28 U.S.C. § 2244(d)(1)(D), the interests of justice require this Court to apply equitable tolling to deem his petition as timely filed." (D.I. 12 at 18). Petitioner contends that a significant portion of his "delay" in bringing his claims was attributable to "the extraordinary circumstances caused by the misconduct of a member of the prosecution team." (D.I. 12 at 18). He also contends that

> the interests of justice call for this Court to apply equitable tolling. To find otherwise would not be equitable as it would penalize [Petitioner] for, through no fault of his own, being unable to file his motion before June 2, 2014. It would be further inequitable to prevent [him] from seeking habeas relief when several similarly situated petitioners will have their claims heard even though they discovered the misconduct around the time [he] did, filed their petitions around the time [he] did, and exhausted their state remedies around the same time [he] did. It would be similarly inequitable to prevent [Petitioner]from having his claims heard given the extensive evidence of OCME misconduct and reliability issues and the State's reliance on the credibility of the OCME to secure [Petitioner's] conviction. Thus, in the interests of justice, this Court should apply equitable tolling in order to deem [Petitioner's] petition as timely filed.

(D.I. 12 at 18-19)

Petitioner's equitable tolling argument is unavailing. Petitioner concedes that, as of April 15, 2014, he had a reasonable basis to conclude that drug evidence of all types at the OCME had been compromised and at least one lab employee was tampering with evidence stored at the OCME as far back as 2010. (D.I. 12 at 17). In fact, Petitioner filed a Rule 61 motion raising the instant OCME/*Brady* claims in the Superior Court by June 2, 2014. Yet, inexplicably, Petitioner fails to explain why he waited until January 2, 2018 to file the same claims in this Court. Contrary to the argument in his reply, Petitioner's general assertion of inequitable treatment of similarly situated petitioners does not explain why he did not file a protective habeas petition at any point after June 2, 2014. Notably, Petitioner does not allege, and the Court does not discern, that any extraordinary circumstances prevented him from filing a "protective" § 2254 petition[4] in this Court along with a motion to stay the proceeding at some point after June 2, 2014 while he was awaiting the Delaware state courts' post-conviction decisions. *See Ross v. Varano*, 712 F.3d 784, 803 (3d Cir. 2013) ("[F]or a petitioner to obtain relief [via equitable tolling] there must be a causal connection, or nexus, between the extraordinary circumstances he faced and the petitioner's failure to file a timely federal petition."). Similarly, Petitioner's failure to file a basic protective habeas petition during the three and one-half years his Rule 61 motion was pending in state court precludes a finding that Petitioner exercised the requisite "due diligence" to warrant equitably tolling the limitations period. *See, e.g.*, *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000) (once the extraordinary circumstance ends, the petitioner must exercise reasonable diligence in filing his petition).

---

[4]     In *Pace v. DiGuglielmo*, the Supreme Court explained that a "petitioner's reasonable confusion about whether a state filing would be timely" when attempting to exhaust state remedies may constitute good cause for him to file a "protective petition in federal court and ask[] the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted." *Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005).

For all of these reasons, the Court concludes that the doctrine of equitable tolling is not available to Petitioner on the facts he has presented.  Accordingly, the Court will deny the instant Petition as time-barred.

## III.   ANALYSIS UNDER SECTION 2254(d)

Even if the Court were to address the claims as though timely filed, they would not warrant relief.  The Superior Court denied Petitioner's Rule 61 motion as time-barred after determining that Petitioner's arguments did not satisfy Rule 61(i)(5)'s exception to the Rule 61(i)(1) time-bar because the arguments did not assert a colorable claim under *Brady v. Maryland*.  *See Rust*, 2017 WL 986169, at \*3.  To the extent the Superior Court's determination that Petitioner did not present a colorable *Brady* claim to excuse his untimeliness constitutes an adjudication on the merits, the Court will exercise prudence and review the decision under § 2254(d).[5]

Pursuant to 28 U.S.C. § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial.  *See* 28 U.S.C. § 2254(d)(1) & (2); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).  This deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied"; as recently explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural

---

[5]     When a state's highest court has adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d).  A claim has been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground.  *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).

principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 98-100 (2011).  Finally, a federal court must presume that the state court's determinations of factual issues are correct.  *See* 28 U.S.C. § 2254(e)(1); *see also Appel*, 250 F.3d at 210.  This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary.  *See* 28 U.S.C. § 2254(e)(1); *see also Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

### A.      OCME Evidence Misconduct/*Brady* Cases in Delaware Courts

Following the discovery of the evidence mishandling at the OCME, Delaware's Office of Defense Services ("ODS") and conflict counsel filed more than 700 Rule 61 motions on behalf of numerous defendants convicted of drug-related charges.  Because the underlying legal issues raised in these motions were largely the same, the Superior Court crafted a procedure for efficiently and logically addressing the majority of the Rule 61 motions.  As the Court explained in *State v. Irwin*:

> The investigation, although still ongoing, has thus far resulted in three OCME employees being suspended, two of those employees being indicted in this Court, and the firing of the Chief Medical Examiner.  However, the full extent of the criminal conduct at the OCME drug lab is still unknown.
>
> The issues uncovered, and those anticipated to be revealed as the investigation continues, have prompted hundreds of motions from indicted and convicted defendants at all stages of the criminal process.  In an attempt to logically and procedurally address these motions, the Court decided to first attempt to address cases that were awaiting trial.  To do so, the Court reached out to the State and the defense bar to schedule hearings on pending matters within that category.  With the professional coordination of all parties involved, the Court has held two hearings to gather evidence regarding the events at the OCME drug lab.  The first hearing, which started on

July 8, 2014, involved defendants Dilip Nyala ("Nyala") and Michael Irwin ("Irwin"). The second hearing, which was held in late August 2014, involved defendants Hakeem Nesbitt ("Nesbitt") and Braaheim Reed ("Reed"). During that August hearing, testimony uncovered that evidence in the Reed case had a significant discrepancy between what the officers seized and what was actually tested at the independent lab retained by the State. As a result, the State entered a *nolle prosequi* of the Reed case. Therefore, this Court's decision relates only to the Nesbitt, Irwin and Nyala cases. By deciding these three cases the Court's intent is to establish a framework for addressing the volume of cases awaiting trial for drug offenses that at one time were stored at the OCME drug lab. The facts surrounding these specific cases involve drug evidence that was sent to the OCME drug lab for testing but was never actually tested by a chemist at that location. **However, it is expected that the Court's ruling will also have an impact on cases where the drugs were tested by the OCME drug lab, and potentially the hundreds of petitions that have been filed pursuant to Superior Court Criminal Rule 61.**

Defendants are challenging the State's ability to use drug evidence at trial through filing various motions *in limine*. The Court will first highlight the specific factual and procedural background of each case, summarize guidance found from other jurisdictions facing similar drug lab improprieties, decide the principles to be used for cases involving drug evidence sent to the OCME drug lab and finally apply those principles to each specific defendant.

*State v. Irwin*, 2014 WL 6734821, at *1–2 (Del. Super. Ct. Nov. 17, 2014) (emphasis added)

(footnote omitted). Similarly, in *State v. Miller*, the Superior Court explained:

The instant motions are just a small sample of the influx of filings made by and on behalf of over 700 criminal defendants following what has come to be known as "the OCME scandal." **The ODS hand-selected the motions in these eight cases for the Court to decide and, because motions filed by the ODS in other cases are identical to those involved here, its decision in these matters should resolve many of the pending Rule 61 motions before the Court.**

*State v. Miller*, 2017 WL 1969780, at *1 (Del. Super. Ct. May 11, 2017) (emphasis added). Two

other pivotal decisions often cited by the Delaware state courts when adjudicating the numerous

other Rule 61 motions based on the OCME evidence mishandling scandal are *[Ira] Brown v. State*, 108 A.3d 1201 (Del. 2015) and *Aricidiacono v. State*, 125 A.3d 677 (Del. 2015).

### B.    Petitioner's Arguments

In his Rule 61 motion, Petitioner presented the same two inter-related arguments presented by many of the other 700 defendants: (1) the State violated *Brady v. Maryland* when it failed to disclose the drug evidence scandal at the OCME during Petitioner's plea process in 2012 (D.I. 13-7 at 73-85); and (2) Petitioner's lack of knowledge about the OCME drug evidence scandal was material to his decision to plead guilty, thereby rendering his guilty plea involuntary pursuant to *Brady v. United States*. (D.I. 13-7 at 85-90). Recognizing the substantial obstacle posed by the growing number of Delaware decisions rejecting hundreds of *Brady* challenges to guilty pleas on the basis of the OCME evidence scandal, Petitioner attempted to distinguish his case by arguing that the Delaware courts had misread *United States v. Ruiz*, 536 U.S. 622 (2002) in certain seminal OCME evidence scandal/*Brady* cases and, primarily, in *Ira Brown*, 108 A.3d 1201 (Del. 2015). (D.I. 13-8 at 11-12). He contended that the reasoning in *Ruiz* should not apply to his case because he entered his plea only five days before his trial was scheduled to begin. (D.I. 13-8 at 11-12). Specifically, he argued that "*Ruiz* should only be read to hold that the government is not required to disclose impeachment information to a defendant in a fast track plea agreement setting. For a plea on the eve of trial or during trial, the normal requirements of *Brady* must apply, as *Ruiz* does not touch upon this issue." (D.I. 13-8 at 6).

The Superior Court rejected Petitioner's interpretation of *Ruiz* and his attempt to distinguish his case from the other Rule 61 OCME evidence mishandling cases, and concluded that he had failed to establish a colorable claim that there was a miscarriage of justice under *Brady v. Maryland*. *See Rust,* 2017 WL 986169, at *4–5. Petitioner appealed, and the Delaware Supreme

13

Court affirmed the Superior Court's judgment "on the basis of and for the reasons stated in its March 8, 2017 order." *Rust,* 2017 WL 5593174 at \*1.

In this proceeding, Petitioner contends that the State violated *Brady v. Maryland* by failing to disclose information about the OCME evidence mishandling scandal before he entered his plea, and that the Delaware state courts unreasonably applied *Brady v. Maryland* and *Ruiz* in holding otherwise.  (D.I. 15 at 10-11).  He also contends that the Delaware state courts unreasonably applied *Brady v. United States* and unreasonably determined the facts when holding that the State's *Brady v. Maryland* violation did not render his guilty plea involuntary.  (D.I. 15 at 12-14).  For the following reasons, the Court rejects Petitioner's arguments.[6]

### 1.   Claim One: Application of *Brady v. Maryland* and *United States v. Ruiz*

The clearly established federal law governing the State's disclosure requirements to a defendant is articulated in *Brady v. Maryland* and its progeny, *United States v. Ruiz*.  Pursuant to *Brady v. Maryland,* "[p]rosecutors have an affirmative duty 'to disclose [*Brady*] evidence . . . even though there has been no request [for the evidence] by the accused,' which may include evidence known only to police."  *Dennis v. Sec'y, Pa. Dep't of Corrs.,* 834 F.3d 263, 284 (3d Cir. 2016). "To comply with *Brady*, prosecutors must 'learn of any favorable evidence known to the others acting on the government's behalf.'"  *Id*.  In order to prevail on a *Brady v. Maryland* claim, a petitioner must establish that: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or it had impeachment value; (2) the prosecution suppressed the evidence,

---

[6]     The petition presents the *Brady v. Maryland*, *Ruiz*, and *Brady v. United States* arguments in three sub-sections of Claim One, and the evidentiary hearing issue in Claim Two.  (*See* D.I. 3 at 2; D.I. 12 at 2).  For ease of analysis, the Court has separated Petitioner's first claim into two separate claims, and addresses the evidentiary hearing issue in a separate section.

"either willfully or inadvertently;" and (3) the evidence was material. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004).

In *Ruiz*, the United States Supreme Court specifically held that the Government is not constitutionally required to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant. *See Ruiz*, 536 U.S. at 633. The *Ruiz* Court explained:

> It is particularly difficult to characterize impeachment information as critical information of which the defendant must always be aware prior to pleading guilty given the random way in which such information may, or may not, help a particular defendant. The degree of help that impeachment information can provide will depend upon the defendant's own independent knowledge of the prosecution's potential case – a matter that the Constitution does not require prosecutors to disclose.

*Ruiz*, 536 U.S. at 629.

Turning to the first prong of the § 2254(d)(1) inquiry, the Court notes that the Delaware state courts correctly identified the *Brady v. Maryland* and *Ruiz* standards applicable to this case. Consequently, the Delaware state court decisions were not contrary to clearly established federal law. *See Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

The Court's inquiry is not over, because it must also determine if the Delaware state courts unreasonably applied the *Brady v. Maryland* and *Ruiz* standards to the facts of Petitioner's case.[7] Significantly, as recognized by the body of Delaware caselaw concerning the OCME evidence misconduct scandal, the OCME evidence mishandling constitutes impeachment evidence that

---

[7]      As previously explained, Petitioner contends that the Delaware state courts improperly relied upon *Ira Brown* in denying his Rule 61 motion. Because, however, the *Ira Brown* Court based its denial of Brown's OCME evidence misconduct claim upon *Brady* and *Ruiz,* the proper focus here is whether the Delaware Supreme Court unreasonably applied *Brady v. Maryland* and *Ruiz* in Petitioner's case.

would only be useful if Petitioner had decided to go to trial.  *See Ira Brown*, 108 A.3d at 1205-06, n.30 (holding that OCME evidence mishandling investigation constitutes impeachment material in Brown's case and in fact patterns like it); *Miller*, 2017 WL 1969780, at *6 (stating that all of hundreds of Rule 61 motions asserting similar *Brady v. Maryland* claims argue that State suppressed valuable impeachment evidence when it failed to disclose that drugs submitted to OCME were being tampered with and/or stolen from lab).  As *Ruiz* specifically held that the Government is not constitutionally required to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant, the Delaware state courts reasonably applied clearly established federal law in rejecting Petitioner's argument that the State violated *Brady v. Maryland* by not providing information about the OCME evidence mishandling scandal before he entered his plea.  *See Ruiz*, 536 U.S. at 633.

Petitioner, however, contends that *Ruiz* is inapplicable to his case because it should be interpreted as only applying to "guilty pleas which occur weeks and/or months prior to a trial date, in contrast to guilty pleas entered only a few days before trial is scheduled to begin."  (D.I. 12 at 45).  The Court is not persuaded.  First, and most importantly, Petitioner has not identified, and the Court has not found, any Supreme Court case limiting the rationale of *Ruiz* to the context of "fast track" plea bargaining.  In fact, the Supreme Court recently reaffirmed that "a guilty plea makes [case-related constitutional defects that occurred prior to the entry of the guilty plea] irrelevant to the constitutional validity of the conviction," "[b]ecause the defendant has admitted the charges against him."  *Class v. United States*, 138 S.Ct. 798, 805-06 (2018).  The absence of any clearly established federal law supporting Petitioner's interpretation provides a sufficient reason for denying relief under § 2254(d)(1).

The Court also is not persuaded by Petitioner's interpretation of *Ruiz*. Although the defendant in *Ruiz* was offered a "fast track" plea bargain, the *Ruiz* Court did not limit its holding to fast track cases. Rather, the *Ruiz* Court framed the issue in broader terms, stating "[w]e must decide whether the Constitution requires preguilty disclosure of impeachment information. We conclude that it does not." *Ruiz*, 536 U.S. at 629. In addition, the *Ruiz* Court did not use limiting language in its holding but, instead, stated broadly that "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *Id*. at 633. Finally, *Ruiz*'s holding was based primarily on the nature of impeachment evidence and its much greater importance to ensuring a fair trial rather than on ensuring a voluntary guilty plea. *Id*. 629.

For these reasons, the Court concludes that the Delaware state courts did not unreasonably apply *Brady v. Maryland* and *Ruiz* in holding that Petitioner failed to present a colorable *Brady* claim.

### 2.    Claim Two: Voluntariness of Petitioner's plea under *Brady v. United States*

Next, Petitioner argues that the Delaware state courts unreasonably applied *Brady v. United States* when denying his argument that the State's failure to disclose the OCME evidence mishandling scandal before he entered his plea rendered his guilty plea involuntary. (D.I. 12 at 50-53; D.I. 15 at 12-14). According to Petitioner, the Delaware state courts erred by focusing on his admission of guilt during his plea colloquy instead of "considering all of the relevant circumstances surrounding" how the State secured his plea agreement when holding that the failure to inform him about the OCME evidence mishandling did not induce him to enter a guilty plea. (D.I. 3 at 24-26; D.I. 12 at 50-53; D.I. 15 at 15).

Petitioner presented this argument to the Superior Court in his Rule 61 motion.   The Superior Court rejected the argument as meritless, relying on prior state court decisions (*Aricidiacono* and *Ira Brown*) and *Brady v. United States.  See Rust*, 2017 WL 986169, at *3-5. The Delaware Supreme Court affirmed the Superior Court's holding for the reasons provided in the Superior Court's decision. Therefore, Petitioner's argument that the Delaware state courts improperly rejected his involuntary plea argument will only warrant habeas relief if the Delaware state court decisions were either contrary to, or an unreasonable application of, *Brady v. United States*, or constituted an unreasonable determination of facts based on the evidence adduced in the Rule 61 proceeding.

In *Brady v. United States,* the Supreme Court held that a guilty plea is not rendered invalid merely because it is entered to avoid a harsher sentence.   In the Court's words:

> A plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (*e.g.* bribes).

*Brady v. United States*, 397 U.S. at 755; *see also Tollett v. Henderson*, 411 U.S. 258, 267 (1973) (explaining a defendant may challenge a conviction based on a guilty plea on the ground that the plea was not "voluntary and intelligent."); *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (noting that the "longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative choices of action open to the defendant."). The Supreme Court further explained that a plea is involuntary if it is induced by "actual or threatened physical harm or by mental coercion overbearing the will of the defendant," or if the defendant is so "gripped" by fear or hope of leniency that he cannot "rationally weigh the

advantages of going to trial against the advantages of pleading guilty." *Brady v. United States*, 397 U.S. at 750.  But a plea is not involuntary "whenever motivated by the defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged." *Id*. at 751.

"[T]he voluntariness of [a defendant's] plea can be determined only by considering all of the relevant circumstances surrounding it." *Brady v. United States*, 397 U.S. at 749.  Although the Supreme Court did not set forth in *Brady v. United States* a comprehensive list of the "relevant circumstances" to be considered when assessing the voluntariness of a plea, the Supreme Court noted that a plea is not unintelligent just because later events prove that going to trial may have been a wiser choice:

> Often the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted. Considerations like these frequently present imponderable questions for which there are no certain answers; judgments may be made that in the light of later events seem improvident, although they were perfectly sensible at the time. The rule that a plea must be intelligently made to be valid does not require that a plea be vulnerable to later attack if the defendant did not correctly assess every relevant factor entering into his decision. A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action. More particularly, absent misrepresentation or other impermissible conduct by state agents, a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise.

*Brady v. United States*, 397 U.S. at 756–57.

The Supreme Court reaffirmed this in *McMann v. Richardson*, 397 U.S. 759 (1970), where it held:

> [t]he decision to plead guilty before the evidence is in frequently involves the making of difficult judgments. All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court. Even then the truth will often be in dispute. In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case . . . . Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts.

397 U.S. 769-70 (1970). Thus,

> [t]he rule that a plea must be intelligently made to be valid does not require that plea be vulnerable to later attack if the defendant did not correctly assess every relevant factor entering into his decision. A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case.

*Brady v. United States*, 397 U.S. at 757. In other words, "the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require **complete** knowledge of the relevant circumstances, but permits a court to accept a guilty plea . . . despite various forms of misapprehension under which a defendant might labor." *Ruiz*, 536 U.S. at 630 (emphasis added).

Finally, it is well-settled that a petitioner challenging the voluntary nature of his plea on habeas review faces a heavy burden. *See Zilich v. Reid*, 36 F.3d 317, 320 (3d Cir. 1994). The "representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977). Notably, there is

> no requirement in the Constitution that defendant must be permitted to disown his solemn admissions in open court that he committed the act with which he is charged simply because it later develops that the state would have had a weaker case than the defendant had thought or that the maximum penalty then assumed applicable has been held inapplicable in subsequent judicial decisions.

*Brady v. United States*, 397 U.S. at 757.

Turning to the first prong of the § 2254(d)(1) inquiry, the Court notes that the Delaware state courts in Petitioner's case correctly identified the *Brady v. United States* standard applicable to Claim Two.  Therefore, the Delaware state courts' denial of the instant argument was not contrary to clearly established federal law.

The Court must also determine if the Delaware state courts unreasonably applied *Brady v. United States* to the facts of Petitioner's case when denying Claim Two.  The instant case is just one in a series of cases concerning the OCME evidence mishandling that have been filed in the District of Delaware.  The District Court, as well as this Court in particular, has already considered and denied as meritless arguments identical to Petitioner's instant argument that the Superior Court unreasonably applied *Brady v. United States* by focusing on the defendant's admission of guilt during the plea colloquy.  *See, e.g.*, *Ratledge v. DeMatteis*, 2019 WL 4643800, at *11 -*12 (D. Del. Sept. 24, 2019); *King v. DeMatteis*, 2019 WL 4643805, at *11-*12 (D. Del. Sept. 24, 2019); *Ross v. DeMatteis*, 2019 WL 4643815, at *11-*12 (D. Del. Sept. 24, 2019) .  Notably, the Third Circuit declined to grant certificates of appealability in those cases.[8]

_____

[8]    For example, in *Ratledge* the Third Circuit opined that

> [j]urists of reason would not dispute the District Court's conclusion that the Delaware Supreme Court's rejection of [Ratledge's] claim was not contrary to, nor an unreasonable application of, *Brady v. United States*. [. . .]  Among other things, jurists of reason would reject [Ratledge's] contention that the Delaware Supreme Court added a threshold test to the standard in *Brady* [*v. United States*] and did not consider the relevant circumstances of the plea agreement as required by *Brady* [*v. United States*].

(*See* D.I. 22 in *Ratledge v. DeMatteis*, C.A. No. 16-843-MN)

Following the same reasoning applied in this Court's earlier OCME evidence misconduct/*Brady* cases, the Court concludes that the Delaware state courts in Petitioner's case did not unreasonably apply *Brady v. United States* by focusing on Petitioner's admission of guilt during the plea colloquy as one of the relevant circumstances required by *Brady v. United States* as a basis for denying Claim Two. Significantly, Petitioner does not dispute that the drugs seized and tested in his case were not what they were purported to be; he admitted his guilt during the plea colloquy; he does not assert his actual innocence; and he received a benefit by pleading guilty because the State dropped the other charge against him and agreed to cap its sentence recommendation at ten years as a result of his plea bargain. (D.I. 14 at 18; D.I. 15 at 12-13).

In addition, and contrary to Petitioner's assertion, the Court finds that the Delaware state courts did not unreasonably determine the facts in rejecting his voluntariness argument. Once again expressing his disagreement with the Delaware state courts' reliance on the Delaware Supreme Court decision *Ira Brown*, Petitioner contends that the Delaware Supreme Court "was also not aware at the time of its decision in *Ira Brown* how pervasive the misconduct at the OCME was." (D.I. 12 at 49).

To reiterate, the Delaware state courts relied on several prior state court decisions – and explicitly cited *Aricidiacono* and *Ira Brown* – when denying Petitioner's argument that the failure to disclose the OCME misconduct rendered his guilty plea involuntary. *See Rust*, 2017 WL 986169, at *3-5 & n.10, 11). In *Aricidiacon*o, the Delaware Supreme Court held that "the poor evidence-handling practices at the OCME, however regrettable," did not entitle defendants who had freely admitted their guilt when pleading guilty to relief under Rule 61. *See Aricidiacono*, 125 A.3d at 678-79. The *Aricidiacono* Court found that, even if it were assumed that the conduct at the OCME amounted to egregious government misconduct, "this conduct did not materially

affect any of the pleas." *Id*. at 680 n.24.  Consistent with *Aricidiacon*o, and as noted by Petitioner, the Delaware Supreme Court found in *Ira Brown* that "[t]here is no evidence to suggest that OCME employees tampered with drug evidence by adding known controlled substances they received for testing" or that they had "planted" evidence.  *See Ira Brown*, 108 A.3d at 1204-05.  By relying on *Ira Brown*, the Delaware state courts in Petitioner's case implicitly adopted the same factual determination that Petitioner's case was not affected by the overall evidence mishandling at the OCME.

Petitioner, however, complains that Delaware state courts in his case erred in relying on *Ira Brown,* because the following "facts" had changed after *Ira Brown* was decided:

> Forensic Chemist Irshad Bajwa was suspended and later terminated after evidence he certified as cocaine was found to not be any illegal substance.  The Delaware Courts were also not aware that forensic chemist Patricia Phillips would be terminated after three reported incidents of evidence mishandling.  Nor were the Delaware Courts aware that Bipin Mody would be terminated for disregarding OCME policies and procedures and for failing to timely perform drug analyses, information that the DOJ erroneously concluded was not *Brady*.  Additionally, the Delaware Courts were unaware that the OCME's credibility issues created an environment in which the State lacked the necessary witnesses to successfully prosecute Mr. Daneshgar.  As the Delaware Courts refused to recognize how the factual environment drastically evolved from the time it decided Ira Brown, this Court must find that the Delaware Court erred by relying on Ira Brown to deny [Petitioner] postconviction relief.

(D.I. 12 at 49-50).  In essence, Petitioner appears to argue that the Delaware state courts unreasonably determined that the circumstances of his case did not differ sufficiently enough from the circumstances in *Ira Brown* to find a link between the overall OCME evidence misconduct and Petitioner's decision to enter a guilty plea.

Because Petitioner challenges the factual basis of the Delaware state court decisions, the relevant inquiry is whether those decisions were "based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

When performing this inquiry, the Court must presume that the Delaware state courts' factual

findings are correct unless rebutted by clear and convincing evidence.  *See 2*8 U.S.C. § 2254(e)(1).

After reviewing Petitioner's argument in the context of the entire record, the Court

concludes that Petitioner has failed to provide clear and convincing evidence rebutting the

Delaware state courts' implicit factual determination that Petitioner failed to distinguish his

circumstances from those in *Ira Brown* sufficiently enough to demonstrate a link between the

general OCME evidence mishandling scandal and his case.  Although Petitioner contends that "the

factual environment [had] drastically evolved from the time [the Delaware Supreme Court]

decided *Ira Brown*," (D.I. 12 at 50), Petitioner fails to demonstrate how the alleged "drastic"

change affected his case.  For instance, the "newly evolved" information regarding the misconduct

of chemists Bajwa and Mody is irrelevant because those individuals did not analyze the drugs in

Petitioner's case.  Rather, forensic chemists Theresa Moore and Farnam Daneshgar analyzed the

drugs in this case.  (D.I. 14 at 3-4).  Also irrelevant is the fact that forensic chemist Patricia Phillips

was subsequently terminated for disregarding OCME policies, because: (1) Phillips did not analyze

the drugs in Petitioner's case; and (2) Phillips' alleged misconduct occurred in 2015,[9] long after

the evidence in Petitioner's case was tested in 2012.

In addition, during a recorded interview with the police, Petitioner admitted to helping

another person grow, gather, and dry marijuana, and that he gave marijuana to a person to sell for

"$1800.00 per pound."  (D.I. 13  at 23-24).  After considering these circumstances together with

Petitioner's failure to assert his factual innocence during the plea colloquy or in this proceeding,

the Court concludes that the Delaware state courts did not unreasonably determine the facts by

---

[9]     "[T]hree incidents of evidence mishandling le[d] to [Phillips's] suspension and resignation
[. . .] in 2015."  *Miller*, 2017 WL 1969780, at *8.

holding that the existence of overall misconduct at the OCME was insufficient to establish that

Petitioner's case was tainted by the same misconduct.

As explained by the Superior Court in *State v. Irwin*, another Delaware post-conviction

case concerning the OCME misconduct cited by the *Aricidiacono* Court:[10]

> To the extent that there are discrepancies between the drugs seized
> from a defendant and those tested by the lab, the individual possibly
> responsible for that conduct has not been identified.  [] [A]s best the
> Court can ascertain, and the parties have not provided evidence to
> the contrary, none of the cases in other jurisdictions that have led to
> the investigation of a particular crime lab have ever resulted in all of
> the evidence being found unreliable and inadmissible simply
> because that evidence was stored or tested at the lab that has been
> compromised.
>
>        *                     *                     *
>
> There is no evidence to date to suggest that proper testing of drugs
> submitted did not occur, or that the chemists were submitting false
> reports, or that critical evidence was withheld by the lab, or that
> there was any misconduct by the police in violation of a defendant's
> rights.  When the smoke clears, what we have is a lab that suffered
> from systematic failures in protocol resulting in evidence being
> stolen, for either sale or personal consumption, and in some
> instances replaced with other drugs.  While the defendants urge this
> Court to find any evidence stored at the OCME drug lab is ipso facto
> unreliable due to a lapse in management and protocol, the Court
> finds that such a blanket ruling is inappropriate.

*State v. Irwin*, 2014 WL 6734821, at *7, *9 (Del. Super. Ct. Nov. 17, 2014).

In short, the OCME evidence mishandling scandal constitutes impeachment evidence that

cannot provide a basis for rendering a defendant's counseled decision to enter a guilty plea

involuntary, especially when that defendant participated in a plea colloquy in open court, freely

---

[10]    Citing *Irwin*, the *Aricidiacono* Court stated that, "[i]n our prior decisions, we found that when defendants freely admitted their guilt by admitting that they possessed illegal narcotics, their lack of knowledge that the OCME's evidence-handling practices were seriously flawed and that some OCME employees had engaged in malfeasance, did not invalidate their pleas." *Aricidiacono*, 125 A.3d at 678-78.

acknowledged his guilt, and has not asserted his factual innocence. Although knowledge of the OCME evidence mishandling scandal may have provided Petitioner with more bargaining leverage, it cannot be said that the lack of that knowledge rendered his guilty plea involuntary.

For these reasons, the Court concludes that the Delaware Supreme Court did not unreasonably determine the facts or unreasonably apply *Brady v. United States* to the facts of Petitioner's case when it held that Petitioner's guilty plea was not rendered involuntary due to his lack of knowledge about the OCME evidence mishandling scandal. Accordingly, the Court will deny Claim Two for failing to satisfy the standards set forth in § 2254(d)(1) and (d)(2).

## IV.   **EVIDENTIARY HEARING**

Although Petitioner requested an evidentiary hearing in his Rule 61 proceeding, the Superior Court denied the Rule 61 motion without holding a hearing and without addressing the request. In his Petition, Petitioner alleges that

> [i]n [Petitioner's] state postconviction proceedings, the State Court denied him any and all ability to further develop the factual record. This included [Petitioner's] specific request for an evidentiary hearing in order to question members of the DOJ and former employees of the OCME about their knowledge of the problems at the OCME and whether any communications took place during which the problems at the OCME were discussed. The State Courts further denied [Petitioner] the ability to create a factual record of the chain of custody of the alleged drug evidence, despite the clear discrepancies in the reported weight of the marijuana recovered from [Petitioner's] property, as the State did not provide nor was the State ordered to produce the necessary chain of custody documents. Furthermore, [Petitioner] was denied the ability to investigate and compel testimony in relation to the credibility issues of Theresa Moore, who was responsible for a portion of the analysis of the alleged drug evidence in this case.
>
> As the State Courts denied [Petitioner] the ability to fully investigate his *Brady* claim and refused to have a full and fair hearing in relation to his *Brady* claim, the State Courts failed to provide [Petitioner] with adequate fact-finding procedures needed to create an adequate factual record to rule upon [Petitioner's] *Brady* claim. Therefore,

> Due Process mandates that this Court hold an evidentiary hearing to
> allow for a complete and accurate factual record to be created in
> relation to [Petitioner's] *Brady* claim.

(D.I. 12 at 55-56).

Based on the foregoing, it appears that Petitioner alleges both a due process violation as a ground for relief and a request for an evidentiary hearing.  For the following reasons, the Court concludes that neither assertion is availing.

### A.    Due Process Argument

It is not the province of a federal habeas court to determine whether state courts have properly applied their own evidentiary rules.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Rather, the question for a habeas court is "whether the [challenged evidentiary decision or instruction] by itself so infected the entire trial that the resulting conviction violates Due Process." *Id.* at 72.

Here, Petitioner has not shown that the Superior Court's failure to conduct an evidentiary hearing for his *Brady v. Maryland* claim denied him rights guaranteed by the due process clause. Delaware Superior Court Criminal Rule 61(h) grants the Superior Court discretion in deciding whether to conduct an evidentiary hearing in connection with a Rule 61 post-conviction relief motion.  *See* Del. Super. Ct. R. 61(h)(1),(3).  The Superior Court does not abuse its discretion in denying an evidentiary hearing request if the record is sufficient to establish that the petitioner's claims lack merit.  *See Johnson v. State*, 129 A.3d 882 (Table), 2015 WL 8528889, at *4 (Del. Dec. 10, 2015).

In his Rule 61 proceeding, Petitioner argued that an evidentiary hearing was necessary to "present a complete factual record in support of his claim through the use of subpoena and compelled testimony" (D.I. 13-7 at 61), and to "call senior members of the Attorney General's

Office to testify as to their contact with the OCME and their possible knowledge of issues at the OCME lab." (D.I. 13-8 at 1). Petitioner also sought to create a "chain of custody" for the "suspected drug evidence in this case." (D.I. 13-8 at 2). The Superior Court, however, had before it the transcript of Petitioner's plea colloquy, the State's response to the Rule 61 motion, the information Petitioner's post-conviction counsel collected regarding the OCME evidence mishandling scandal during his independent investigation for Petitioner's Rule 61 motion, and the formal results of the Delaware Department of Justice's investigation into the OCME evidence mishandling scandal, all of which provided a sufficient basis for the Superior Court to decide Petitioner's Rule 61 motion. *See Pennewell v. State*, 884 A.2d 512 (Table), 2005 WL 578444, at * 2 (Del. Jan. 26, 2005).

Permitting Petitioner to present additional impeachment evidence or further explore issues he waived by virtue of his 2012 guilty plea would not have aided the Superior Court in ruling on Petitioner's *Brady* claim. For instance, asking members of the DOJ to testify about their knowledge of OCME questions would have added nothing to Petitioner's Rule 61 motion. Petitioner pleaded guilty on July 25, 2012, yet the discovery of the OCME discrepancies did not occur until January 14, 2014.

Likewise, there was no need for an evidentiary hearing to trace the chain of custody of Petitioner's drug evidence because Petitioner waived the right to pursue any possible suppression motion on that basis when he pleaded guilty in 2012 and accepted the benefits of the State's plea offer.

Finally, Petitioner's catchall argument that an evidentiary hearing was needed to create a complete factual record for his *Brady* claim fails for the same reason – Petitioner waived the right to learn about *Brady* impeachment evidence when he pleaded guilty in July 2012. At the July 25,

2012 Superior Court guilty plea colloquy, Petitioner was specifically asked if he admitted his guilt to the drug dealing charge, and he answered "Yes." (D.I. 13 at 53-54).  As previously explained, Petitioner is bound by the admissions he made during his 2012 guilty plea colloquy.  *See supra* at Section III.B.2; *see also Blackledge*, 431 U.S. at 73–74.  Because he is bound by his prior incriminatory admissions, Petitioner had no right to an evidentiary hearing to explore further subjects he waived by virtue of his July 25, 2012 guilty plea.

Thus, to the extent Claim Three asserts that the Delaware state courts violated Petitioner's due process rights by denying his Rule 61 motion without holding an evidentiary hearing, the Court will deny the argument as meritless.

## B.        Request for an Evidentiary Hearing in this Proceeding

A habeas petitioner is not entitled to an evidentiary hearing in most cases.  The Supreme Court has explained that "[a]lthough state prisoners may sometimes submit new evidence in federal court, the AEDPA's statutory scheme is designed to strongly discourage them from doing so."  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1401 (2011).  Typically, requests for an evidentiary hearing in a federal habeas proceeding are evaluated under 28 U.S.C. § 2254(e)(2), which provides:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that
>
> > (A)  the claim relies on –
> >
> > > (i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii)  a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for

> constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

"In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007); *see also* Rule 8 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254. When deciding whether to grant a hearing, the "court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations," taking into consideration the "deferential standards prescribed by 28 U.S.C. § 2254." *Schriro*, 550 U.S. at 474. An evidentiary hearing is not necessary if the issues can be resolved by reference to the record developed in the state courts. *Id*.

The Court has determined that Petitioner's claims are meritless under § 2254(d)(1) and (2), and Petitioner's assertions do not demonstrate how a hearing would advance his arguments. Therefore, the Court will deny Petitioner's request for an evidentiary hearing.

## V.    <u>CERTIFICATE OF APPEALABILITY</u>

A district court issuing a final order denying a § 2254 petition must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011); 28 U.S.C. § 2253(c)(2). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court has concluded that the instant Petition does not warrant relief.  Reasonable jurists would not find this conclusion to be debatable.  Accordingly, the Court will not issue a certificate of appealability in this case.

## VI.   **CONCLUSION**

For the reasons discussed, the Court concludes that the Petition must be denied.  An appropriate Order will be entered.

31